IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-42

No. 380A20

Filed 23 April 2021

IN THE MATTER OF: A.M. and E.M.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 15 May 2020 by Judge V.A. Davidian III in District Court, Wake County. This matter was calendared for argument in the Supreme Court on 19 March 2021, but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Mary Boyce Wells, Senior County Attorney, for petitioner-appellee Wake County Human Services.*

*Coats+Bennett, PLLC, by Gavin B. Parsons, for appellee Guardian ad Litem.*

*Dorothy Hairston Mitchell for respondent-appellant mother.*

MORGAN, Justice.

Respondent-mother appeals the order terminating her parental rights to her minor children "Adam," born in October 2011, and "Efia," born in March 2014.[1] Because clear, cogent, and convincing evidence supported at least one ground for the termination of respondent-mother's parental rights, and because it was not an abuse of discretion for the trial court to determine that termination of respondent-mother's

---

[1] We use pseudonyms to protect the identities of the minor children and for ease of reading.

parental rights was in the best interests of the children, we affirm the trial court's order.

## I. Factual and Procedural Background

¶ 2 Respondent-mother, the father, and their son Adam have been involved with Wake County Human Services (WCHS) since 2012. In 2013 and 2014, WCHS received reports which detailed the parents' instances of substance abuse, as well as respondent-mother's physical confrontations with the childcare providers for Adam and Efia. When Efia was born in 2014, both she and respondent-mother tested positive for marijuana. In April 2015, WCHS received a report that the parents were homeless and that the children's maternal grandparents, who themselves had been the subject of several prior child protective services (CPS) reports regarding the care of Efia, were allowing Adam and Efia to reside with them. The parties agreed that the children would continue to reside with the maternal grandparents pursuant to a safety assessment, and WCHS closed the case in May 2015 with services recommended.

¶ 3 In March 2016, WCHS received a report indicating that respondent-mother was arrested and charged with assault after she "drunkenly confronted the father with a knife while pushing [Efia] in a stroller." Respondent-mother had failed to comply with a medication regimen prescribed for her depression and had expressed thoughts of suicidal ideation. WCHS initiated in-home services for the family and

requested that respondent-mother comply with a substance abuse assessment. While respondent-mother initially engaged in residential substance abuse treatment with the children, she was discharged from the program for noncompliance in September 2016. Following the discharge, a maternal relative came forward to provide support for the juveniles, and WCHS closed its case in November 2016.

¶ 4 WCHS received a report on 20 April 2017 that respondent-mother and the maternal grandmother had physically assaulted each other in front of Adam and Efia, prompting respondent-mother and the children to move into a Salvation Army shelter with the assistance of CPS. Shortly thereafter, respondent-mother and the father participated in another affray which occurred in front of the children. This fracas resulted in respondent-mother's arrest. While respondent-mother was incarcerated, the children resided with the father for a few days before returning to their maternal grandmother's home.

¶ 5 Following respondent-mother's release from incarceration, a social worker met with respondent-mother and the children at the home of the maternal grandmother. Respondent-mother was "visibly impaired and smelled of alcohol," and "accused the [maternal] grandmother of substance abuse" before producing drug paraphernalia from the maternal grandmother's cigarette pack. WCHS removed the juveniles from the home, as efforts to consult with the parents concerning a proper familial placement for the children were unsuccessful. WCHS filed juvenile petitions on 19

June 2017 alleging that the children were neglected juveniles, and WCHS subsequently filed an amended juvenile petition regarding both children on 28 June 2017. The trial court entered orders granting nonsecure custody of the children to WCHS on 19 June 2017 pursuant to the first juvenile petitions and authorizing WCHS to place the children in a licensed foster care home.

¶ 6     On 13 September 2017, respondent-mother and the father consented to an adjudication that the children were "neglected juveniles" as defined by N.C.G.S. § 7B-101(15). In its consent order on adjudication and disposition which was issued on the same date as the adjudication, the trial court allowed WCHS to retain legal custody of the children and ordered respondent-mother to: (1) follow all recommendations of a substance abuse assessment; (2) refrain from the use of illegal or impairing substances and submit to random drug screens; (3) obtain and maintain housing sufficient for herself and her children that is free of transient household members and substance abuse, and provide proof of such housing; (4) obtain and maintain legal income sufficient to meet her needs and the needs of her children, and provide proof of such income to WCHS on at least a monthly basis; (5) engage in a domestic violence assessment through Interact and follow all recommendations; (6) complete a psychological evaluation and follow all recommendations; (7) follow the terms of her probation and refrain from further illegal activity; (8) comply with a visitation agreement during her visits with the children; and (9) maintain regular contact with

the social worker at WCHS, notifying WCHS of any change in situation or circumstances within five business days. The trial court further ordered WCHS to continue to make reasonable efforts to eliminate the need for placement of the children outside of the home.

¶ 7    Following an April 2018 permanency planning hearing, the trial court entered a 24 May 2018 order in which it found that respondent-mother and the father had been incarcerated from February to mid-March 2018. The trial court acknowledged that respondent-mother was pregnant at the time of the hearing, and determined that after respondent-mother and the father's respective releases from incarceration, the parents were residing together in a boarding house that was not appropriate for the children. Respondent-mother had been diagnosed with severe alcohol use disorder and severe cannabis use disorder in early remission, as well as post-traumatic stress disorder, anxiety, and depression. While respondent-mother denied using marijuana since her release from incarceration and upon learning that she was pregnant, the trial court noted that she had tested positive for marijuana twice in April 2018 and had admitted to consuming alcohol since her release from jail. The trial court established that "[n]either parent has consistently demonstrated a willingness to address the chronic substance abuse and domestic violence that has dominated their family for quite some time." As for the children's current placements, the trial court found that the placements were appropriate and were meeting the needs of the

juveniles. The tribunal also found that the children had bonded with their caregivers, who were willing to provide long-term care for both children. The trial court concluded that a primary plan of adoption with a secondary plan of reunification would serve the children's best interests.

¶ 8     On 3 July 2018, WCHS filed a motion to terminate the parental rights of respondent-mother and the father to the children, asserting, under N.C.G.S. § 7B-1111(a)(1), (2), and (3), the grounds of (1) neglect, (2) failure to show reasonable progress in correcting the conditions which initially led to the removal of the children from the home, and (3) willfully failing to pay a reasonable portion of the cost of care for the children despite the ability to do so.

¶ 9     Following an April 2019 permanency planning hearing, the trial court entered a 2 May 2019 order in which it found that respondent-mother had acquired a residence which was structurally sufficient for a child. However, a GAL volunteer visiting the residence observed a person in the living room who was visibly impaired to the point of unconsciousness, and the GAL volunteer likewise noticed that the parents also appeared to be impaired. Nevertheless, the family exhibited a strong bond during visitations with the children, and the parents exhibited an ability to provide appropriate care for the juveniles for short periods of time in structured, supervised settings. The trial court changed the primary plan for the children from adoption to guardianship with the secondary plan remaining reunification.

¶ 10    In a 19 September 2019 order which was entered following a July 2019 permanency planning hearing, the trial court found that respondent-mother maintained adequate housing, did not receive consistent income, attended weekly therapy sessions and met with a psychiatrist to receive treatment for her mental health issues, and missed three random drug screens in March and May 2019. On 14 April 2019, law enforcement officers responded twice to reports of domestic violence at respondent-mother's residence, which resulted in law enforcement officers removing the father from the home. The trial court also found that "any progress made by either parent [wa]s generally short-lived. Neither parent ha[d] made adequate progress in a reasonable period of time to alleviate the conditions that led to the children's initial removal from the home." The trial court further found that Adam was doing well in his placement, that Efia was receiving services appropriate for her needs, and that each child's respective caregiver intended to adopt when possible. The trial court changed the primary plan for the children from guardianship back to adoption with the secondary plan remaining reunification.

¶ 11    On 9 January and 4 February 2020, the trial court conducted a hearing on WCHS's motion to terminate respondent-mother's and the father's parental rights to the children. In an order entered 15 May 2020, the trial court found the existence of grounds to terminate respondent-mother's parental rights under N.C.G.S. § 7B-1111(a)(1), (2), and (3), and further concluded that it was in the children's best

interests to terminate respondent-mother's parental rights. *See* N.C.G.S. § 7B-1110(a) (2019).[2] Accordingly, the trial court granted WCHS's motion to terminate respondent-mother's parental rights to the juveniles in the 15 May 2020 order, from which respondent-mother appeals to this Court.

¶ 12        On appeal, respondent-mother challenges each of the three grounds which were found to exist by the trial court as a basis upon which to terminate her parental rights. Respondent-mother likewise opposes the trial court's conclusion that termination of her parental rights was in the children's best interests.

## II.    Legal Standard

¶ 13        The North Carolina General Statutes set forth a two-step process for the termination of parental rights. After the filing of a petition for the termination of parental rights, a trial court conducts a hearing to adjudicate the existence or nonexistence of any grounds alleged in the petition as set forth under N.C.G.S. § 7B-1111. N.C.G.S. § 7B-1109(e) (2019). Then, following an adjudication that at least one ground exists to terminate the parental rights of a respondent-parent, the trial court will determine whether terminating the parental rights of the respondent-parent is in the child's best interests. N.C.G.S. § 7B-1110(a).

¶ 14        We review a trial court's adjudication that a ground exists to terminate

---

[2] The father relinquished his parental rights to the children and is not a party to this appeal.

parental rights under N.C.G.S. § 7B-1111 "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re E.H.P.*, 372 N.C. 388, 392 (2019) (quoting *In re Montgomery*, 311 N.C. 101, 111 (1984)). "Unchallenged findings of fact 'are deemed supported by competent evidence and are binding on appeal.' " *In re J.S.*, 374 N.C. 811, 814 (2020) (quoting *In re T.N.H.*, 372 N.C. 403, 407 (2019)). "[A]n adjudication of any single ground for terminating a parent's rights under N.C.G.S. § 7B-1111(a) will suffice to support a termination order." *Id.* at 815 (first citing *In re B.O.A.*, 372 N.C. 372, 380 (2019); then citing *In re Moore*, 306 N.C. 394, 404 (1982)).

¶ 15    In the present case, the trial court concluded that clear, cogent, and convincing evidence established the existence of all three alleged grounds to terminate respondent-mother's parental rights under N.C.G.S. § 7B-1111(a)(1)–(3).

¶ 16    Pursuant to N.C.G.S. § 7B-1111(a)(2), a trial court may terminate parental rights upon a finding that "[t]he parent has willfully left the [child] in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the [child]." N.C.G.S. § 7B-1111(a)(2) (2019). "Only reasonable progress in correcting the conditions must be shown." *In re J.S.*, 374 N.C. at 819 (quoting *In re L.C.R.*, 226 N.C. App. 249, 252 (2013)). "[T]he nature and extent of the parent's reasonable progress . . . is evaluated

for the duration leading up to the hearing on the motion or petition to terminate parental rights." *Id.* at 815 (emphasis omitted) (quoting *In re A.C.F.*, 176 N.C. App. 520, 528 (2006)); *see also In re Ballard*, 311 N.C. 708, 715 (1984) ("The determinative factors must be the best interests of the child and the fitness of the parent to care for the child *at the time of the termination proceeding*.").

¶ 17        A factor consistently recognized as relevant in the determination of whether grounds exist for the termination of parental rights pursuant to N.C.G.S. § 7B-1111(a)(2) is whether a parent has complied with a judicially adopted case plan. *See In re B.O.A.*, 372 N.C. at 384. Generally speaking, we have held that "a trial judge should refrain from finding that a parent has failed to make reasonable progress . . . in correcting those conditions which led to the removal of the juvenile simply because of his or her failure to fully satisfy all elements of the case plan goals." *In re S.M.*, 375 N.C. 673, 685 (2020) (extraneity omitted) (quoting *In re B.O.A.*, 372 N.C. at 385). However, a respondent-parent's " 'extremely limited progress' in correcting the conditions leading to removal" of the children from their care in the first place, especially when the remedy for such conditions is memorialized in the respondent-parent's case plan, will support a trial court's ultimate determination that grounds exist to terminate that parent's rights under N.C.G.S. § 7B-1111(a)(2). *In re A.B.C.*, 374 N.C. 752, 760 (2020) (quoting *In re B.O.A.*, 372 N.C. at 385).

¶ 18        "If [the trial court] determines that one or more grounds listed in section 7B-

1111 are present, the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile to terminate parental rights." *In re A.R.A.*, 373 N.C. 190, 194 (2019) (extraneity omitted) (quoting *In re D.L.W.*, 368 N.C. 835, 842 (2016)). We review the trial court's assessment of a child's best interests for abuse of discretion. *In re A.R.A.*, 373 N.C. at 199. A trial court's determination will remain undisturbed under an abuse of discretion standard so long as that determination is not "manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re A.U.D.*, 373 N.C. 3, 6–7 (2019) (quoting *In re T.L.H.*, 368 N.C. 101, 107 (2015)).

## III. Adjudication

¶ 19 Respondent-mother does not challenge any of the findings of fact made by the trial court in its determination that grounds existed for the termination of respondent-mother's parental rights pursuant to N.C.G.S. § 7B-1111(a)(2). On the other hand, respondent-mother argues that although she "did not correct *all* the conditions that led to the children's removal, she . . . made 'reasonable progress under the circumstances.'" We disagree with respondent-mother's depiction of her compliance with her case plan.

¶ 20 In its unchallenged Findings of Fact 15–22, the trial court detailed the conditions which led to the children's removal from the home; namely, "substance abuse, domestic violence and homelessness." In its 13 September 2017 consent order,

the trial court ordered respondent-mother to comply with a case plan referred to as the "Out of Home Family Services Agreement" to address the reasons for the children's removal from her care. In unchallenged Finding of Fact 27, the trial court delineated the terms of the Agreement relating to the conditions which led to the removal of the juveniles from respondent-mother's home:

> 27.     [In its 13 September 2017 consent order,] [t]he [court] ordered [respondent-]mother to comply with the following conditions:
>
> a.     Follow all recommendations from a substance abuse assessment through [WCHS].
>
> b.     Refrain from using illegal or impairing substances and submit to random drug screens.
>
> c.     Obtain and maintain housing sufficient for herself and the children free of transient household members and substance use.
>
> . . . .
>
> e.     Complete a domestic violence assessment through Interact and follow recommendations.

A review of the record convinces us of the nexus between the court-ordered conditions and the bases for the children's removal. *See In re E.B.*, 375 N.C. 310, 323–24 (2020) ("There must be a nexus between the components of the court-approved case plan with which respondent failed to comply and the conditions which led to the juvenile's removal from the parental home." (extraneity omitted) (quoting *In re B.O.A.*, 372 N.C. at 385)).

¶ 21    The trial court's unchallenged findings of fact also describe respondent-mother's failures to comply with the conditions set forth in the 13 September 2017 consent order during the almost twenty-eight-month period between entry of the order and the 9 January 2020 hearing on WCHS's motion to terminate respondent-mother's parental rights:

> 30.   . . . . [Respondent-]mother twice tested positive for marijuana in April [2018] while pregnant [with a third child] and admitted that she continued to drink alcohol.
>
> . . . .
>
> 32.   Throughout 2018, [respondent-]mother did not consistently comply with random drug screens or provide information to WCHS to verify her treatment progress or participation in . . . domestic violence education. . . .
>
> . . . .
>
> 35.   [Respondent-]mother moved into an apartment . . . in March 2019. . . . [But] during a home visit in 2019, the GAL volunteer observed a person in the home that was visibly impaired to the point of unconsciousness while [respondent-]mother . . . w[as] present.
>
> 36.   . . . . [Respondent-]mother continued to attend therapy sessions, but consistently refused to comply with random drug screens.
>
> 37.   On April 14, 2019, Raleigh police responded to two domestic violence calls at [respondent-]mother's home. . . .
>
> 38.   On August 5, 2019, [respondent-]mother was involved in a physical altercation with the children's maternal grandmother . . . .
>
> 39.   On September 14, 2019, Raleigh police again

responded to a report of domestic violence at [respondent-]mother's residence . . . . Tellingly, [respondent-]mother was openly drinking alcohol while talking to the police. When asked about the alcohol by the police officer, [respondent-]mother simply explained that she could hold her liquor.

. . . .

42. On September 19, 2019, [respondent-]mother completed another substance abuse assessment. During the interview with the assessor, [respondent-]mother insisted that she had not used drugs or alcohol for three years despite testing positive for marijuana the month prior. [Respondent-]mother had refused to comply with any additional drug screens. . . .

42.[3] On December 11, 2019, Raleigh police once again responded to [respondent-]mother's home after [respondent-]mother reported that she had been physically assaulted by her houseguest. [Respondent-]mother knowingly allowed a male gang member to stay in her home for a few days. After drinking some amount of alcohol, she confronted the guy and demanded that he leave the home. [Respondent-]mother stated that the man became upset when she asked him to leave and jumped on top of her while holding a knife to her cheek. She hit him in the head with a glass bottle and was able to call 911. The houseguest, on the other hand, told police that [respondent-]mother pulled a knife on him and bit him in the face.

. . . .

44. [Respondent-]mother has not complied with domestic violence counseling or educational programs . . . as previously ordered by the [c]ourt. Additionally, there is no evidence before the [c]ourt that [respondent-]mother

---

[3] The trial court's order reflects two findings of fact numbered 42.

has completed substance abuse treatment . . . .

¶ 22 While the trial court recognized that respondent-mother was able to acquire a structurally safe and appropriate residence, the trial court simultaneously found that the father—who was a frequent focus of the domestic violence issues within the family—"spent a significant amount of time in the home" and that both parents continued to "exhibit concerning judgment and behaviors" within that environment, as evidenced by the aforementioned GAL volunteer who discovered an unidentified, unconscious, and impaired person in respondent-mother's apartment. Further, law enforcement officers responded to respondent-mother's apartment on three occasions for domestic violence incidents involving the father after respondent-mother's acquisition of the structurally appropriate housing. Just one month prior to the termination hearing, respondent-mother allowed a male gang member to reside with her, precipitating yet another domestic violence incident when respondent-mother became intoxicated and asked the male to leave.

¶ 23 Although respondent-mother testified that she had participated in substance abuse support groups and had abstained from marijuana use for at least a year, the trial court's unchallenged findings of fact detail respondent-mother's multiple positive tests for marijuana, her consistent refusal to comply with drug screens, her failure to complete substance abuse treatment and domestic violence counseling programs, and repeated acts of domestic violence involving her which incorporated

the consumption of alcohol.

¶ 24        Despite respondent-mother's contention on appeal that "it is clear that [she] made reasonable progress in correcting the conditions that led to the children's removal," the recounted findings of fact of the trial court support the conclusion that, even crediting respondent-mother's inconsistent engagement with a few court-ordered resources, she failed to make reasonable progress toward correcting the substance abuse and domestic violence issues which led to the removal of the children from her care. *See In re J.S.*, 374 N.C. at 815 ("A respondent's prolonged inability to improve her situation, despite some efforts in that direction, will support a finding of lack of progress sufficient to warrant termination of parental rights under section 7B-1111(a)(2)." (extraneity omitted) (quoting *In re J.W.*, 173 N.C. App. 450, 465–66 (2005), *aff'd per curiam*, 360 N.C. 361 (2006))); *In re Z.A.M.*, 374 N.C. 88, 99 (2020) (upholding a termination of parental rights based on N.C.G.S. § 7B-1111(a)(2) when "viewing the evidence as a whole, it appear[ed] that the trial court correctly concluded that respondent-father's three-month period of sobriety was outweighed by his continuous pattern of relapse" over a twenty-two-month period). Therefore, the trial court's adjudication that the ground exists, as embodied in N.C.G.S. § 7B-1111(a)(2), that respondent-mother has willfully left her children in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting

those conditions which led to the removal of the juveniles is supported by clear, cogent, and convincing evidence. As a result, we affirm the trial court's determination as to the existence of at least one ground upon which to terminate respondent-mother's parental rights.

"In light of our conclusion that the trial court properly adjudicated a ground for terminating respondent-mother's parental rights under N.C.G.S. § 7B-1111(a)(2), we deem it unnecessary to address respondent-mother's contentions" regarding the grounds of neglect and failure to pay a reasonable portion of the cost of care under N.C.G.S. § 7B-1111(a)(1) and (3), respectively. *In re S.M.*, 375 N.C. at 687 (citing *In re A.R.A.*, 373 N.C. at 194).

## IV.    Disposition

Respondent-mother also challenges the trial court's conclusion that termination of her parental rights was in the children's best interests. In her sole argument before this Court concerning the best interests determination, respondent-mother contends that the trial court "completely disregarded the strong bond between [her] and the children in favor of the alleged bond between the children and their foster parents." In support of this contention, respondent-mother directs our attention to portions of the trial court's Findings of Fact 53 and 55 which state that "the children are bonded with their mother" and "love their mother," along with several examples in the record which acknowledge the positive reactions of the

children upon their reunions with respondent-mother during visitation sessions.

¶ 27 If a trial court adjudicates the existence of one or more grounds for terminating parental rights, it then progresses to the dispositional phase of the proceedings where it "shall determine whether terminating the parent's rights is in the juvenile's best interest[s]" and shall consider the following criteria:

> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a). The trial court shall then make written findings of fact as to those criteria which are relevant to its determination. *In re Z.A.M.*, 374 N.C. at 99. We review a trial court's assessment of a child's best interests for abuse of discretion. *See In re A.R.A.*, 373 N.C. at 199. "[A]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *Id.* (alteration in original) (quoting *In re T.L.H.*, 368 N.C. at 107).

¶ 28 In making its best interests determination, the trial court must consider all of

the factors in N.C.G.S. § 7B-1110(a), even though it is not required to expressly make written findings as to each. *See In re A.R.A.*, 373 N.C. at 199 ("It is clear that a district court must consider all of the factors in section 7B-1110(a). The statute does not, however, explicitly require written findings as to each factor." (extraneity omitted) (quoting *In re A.U.D.*, 373 N.C. at 10)).

¶ 29     At the conclusion of the termination of parental rights hearing on 4 February 2020, the trial court acknowledged each of the six factors set forth in N.C.G.S. § 7B-1110(a) and reasoned that the matter would be resolved by its evaluation of the quality of the bond between the children and respondent-mother, and the quality of the bond between the children and the proposed adoptive parents. In its subsequent 15 May 2020 order terminating respondent-mother's parental rights, the trial court made findings of fact which addressed individually the six factors enumerated in N.C.G.S. § 7B-1110(a)(1)–(6). Once again, respondent-mother fails to challenge the trial court's findings of fact, which are therefore deemed to be supported by competent evidence and hence are binding on appeal. *See In re J.S.*, 374 N.C. at 814.

¶ 30     While respondent-mother argues that the trial court disregarded the bond between herself and the children in favor of the bond between the children and their foster parents, "the bond between parent and child is just one of the factors to be considered under N.C.G.S. § 7B-1110(a), and the trial court is permitted to give greater weight to other factors." *In re Z.L.W.*, 372 N.C. 432, 437 (2019); *see also In re*

*A.J.T.*, 374 N.C. 504, 512 (2020) (upholding a trial court's decision to terminate the respondent-parent's parental rights to a child despite the trial court's finding that the child "is very bonded" with respondent-mother when "[i]t [wa]s clear . . . [the trial court] considered several factors in making the best interests determination").

¶ 31        Here, in accordance with its requirement to consider the bond between the children and respondent-mother as a relevant factor in the determination of the juveniles' best interests regarding the issue of the termination of respondent-mother's parental rights, the trial court found that "[b]oth children acknowledge and love their mother, but both children have stated that they feel safe and secure in their current placements." The trial court also found that, despite the existence of a bond between respondent-mother and the children, "[respondent-]mother does not provide healthy parental boundaries" as evidenced by threats of physical violence which were made by respondent-mother during her visitation sessions with the juveniles. Contrary to respondent-mother's contention that the trial court "completely disregarded" this factor which is contained in N.C.G.S. § 7B-1110(a)(4), it appears that the trial court weighed the evidence in the record which it considered to be relevant to the factor, recognized the bond between respondent-mother and the children through referencing the bond in its findings of fact, and ultimately assigned greater weight to other factors identified in N.C.G.S. § 7B-1110(a) in concluding that the termination of respondent-mother's parental rights would serve the best interests of the children.

This evaluation of the factors which are listed in N.C.G.S. § 7B-1110(a) has been recognized by this Court to properly be within the purview of the trial court. *See In re Z.L.W.*, 372 N.C. at 437; *In re A.J.T.*, 374 N.C. at 512.

¶ 32         Notably, the trial court addressed N.C.G.S. § 7B-1110(a)(1)–(2) by recognizing the age of each child and finding that there was "a high likelihood that both children w[ould] be adopted" because Adam and Efia were placed with a caregiver who "intend[ed] to adopt as soon as possible." In conformance with N.C.G.S. § 7B-1110(a)(3), the trial court found that "[t]erminating the rights of [respondent-]mother w[ould] help accomplish the primary plan of adoption for these children and help achieve permanence . . . following years of uncertainty and instability." As to the quality of the relationship between the children and their proposed adoptive parents which is the factor embodied in N.C.G.S. § 7B-1110(a)(5), the trial court found that "[Efia] ha[d] developed a strong bond with her [caregiver] and the other children in the home and [wa]s considered a part of the family." Adam was also seen as thriving in his placement, and despite being placed in separate homes, the children were able to spend significant time together due to the efforts of their respective families. As to other relevant considerations, the trial court found, in accordance with N.C.G.S. § 7B-1110(a)(6), that between October 2019 and the termination of parental rights hearing on 9 January and 4 February 2020, respondent-mother missed several visits with the children without explanation. Within its fact-finding responsibility, the trial court

determined that despite respondent-mother's testimony that she would not use drugs or consume alcohol if the children were returned to her care, "her actions speak volumes louder than her words and the [trial court] finds that her pronouncements are not credible." *See In re D.L.W.*, 368 N.C. at 843 ("The trial judge had the responsibility to pass upon the credibility of the witnesses and the weight to be given their testimony and the reasonable inferences to be drawn therefrom." (extraneity omitted) (quoting *Knutton v. Cofield*, 273 N.C. 355, 359 (1968))). Consequently, we are not inclined to view the trial court's conclusion that the best interests of the juveniles were served by the termination of respondent-mother's parental rights as an outcome which was arbitrary or manifestly unsupported by reason. *See In re A.U.D.*, 373 N.C. at 6. In our analysis, the trial court appropriately exercised its discretion to weigh the statutory factors contained in N.C.G.S. § 7B-1110(a) in order to properly conclude that it was in the best interests of the children to terminate the parental rights of respondent-mother.

## V. Conclusion

We are satisfied that the trial court's determination that grounds existed to terminate the parental rights of respondent-mother under N.C.G.S. § 7B-1111(a)(2) was supported by clear, cogent, and convincing evidence. Further, we are convinced that the trial court's conclusion that the termination of the parental rights of respondent-mother was in the best interests of the children was neither arbitrary nor

manifestly unsupported by reason. Therefore, we affirm the trial court's 15 May 2020 order terminating respondent-mother's parental rights.

AFFIRMED.